DAVID W. TUFTS (SBN 180817)
TRINITY JORDAN, *pro hac vice forthcoming*
JOHN R. RICHARDSON, *pro hac vice forthcoming*
david.tufts@dentons.com
trinity.jordan@dentons.com
johnny.richardson@dentons.com
**DENTONS DURHAM JONES PINEGAR P.C.**
111 South Main Street
Salt Lake City, UT  84111
Tel: 801-415-3000 / Fax: 801-415-3500

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN BUSINESS BROKERS UTAH L.L.C., a Delaware limited liability company; EEPHUS GROWTH FUND II, LLC, a Wyoming limited liability company; GEN 111 LLC, an Oklahoma limited liability company; PRIMARY INVESTMENTS I, LLC, an Oklahoma limited liability company; and SD 2052 LLC, an Oklahoma limited liability company, | Case No. |
| | **COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| PEAK CAPITAL GROUP LLC, a Utah limited liability company; CENTERSTONE ESCROW, INC., a California corporation; GARCIA & PHAN, a California Professional Law Corporation; JESSICA OLIVARRIA, an individual; ROBERT PHAN, an individual; FRANCISCO PEREA, an individual; OLIVER SALAZAR, an individual; MARQUEE INVESTMENT LENDING SERVICES, LLC, a Georgia limited liability company; VANGUARD CAPITAL SOLUTIONS LLC, a Nevada limited liability company; CRAIG HALPERIN, an individual; AARON WEITZMAN, an individual; JAMES WARREN, an individual; TRAVIS CAPSON, an individual; and DOES 1 through 10, inclusive, | |
| Defendants. | |

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

Plaintiffs AMERICAN BUSINESS BROKERS UTAH L.L.C. ("American Business Brokers"), EEPHUS GROWTH FUND II, LLC ("Eephus"), GEN 111 LLC ("Gen 111"), PRIMARY INVESTMENTS I, LLC ("Primary Investments"), and SD 2052 LLC ("SD 2052") (collectively, "Plaintiffs"), by and through their attorneys of record, complain of and against Defendants PEAK CAPITAL GROUP LLC ("Peak Capital"), CENTERSTONE ESCROW, INC. ("Centerstone"), GARCIA & PHAN ("Garcia & Phan"), JESSICA OLIVARRIA ("Olivarria"), ROBERT PHAN ("Phan"), FRANCISCO PEREA ("Perea"), OLIVER SALAZAR ("Salazar"), MARQUEE INVESTMENT LENDING SERVICES, LLC ("Marquee"), VANGUARD CAPITAL SOLUTIONS LLC ("Vanguard"), CRAIG HALPERIN ("Halperin"), AARON WEITZMAN ("Weitzman"), JAMES WARREN ("Warren"), TRAVIS CAPSON ("Capson"), and DOES 1 through 10, inclusive (collectively, "Defendants"), and allege as follows:

## PARTIES

1.      Plaintiff American Business Brokers is a Delaware limited liability company with its principal place of business at 5322 S. Hillsden Drive, Salt Lake City, Utah 84117.

2.      Plaintiff Eephus is a Wyoming limited liability company with its principal place of business at 412 W. Rivers Edge Drive, Provo, Utah 84604.

3.      Plaintiff Gen 111 is an Oklahoma limited liability company with its principal place of business at 1200 N. Shartel Ave., Suite 1200, Oklahoma City, Oklahoma 73103.

4.      Plaintiff Primary Investments is an Oklahoma limited liability company with its principal place of business at 1200 N. Shartel Ave., Suite 1200, Oklahoma City, Oklahoma 73103.

5.      Plaintiff SD 2052 is an Oklahoma limited liability company with its principal place of business at 4013 River Branch Trail, Plano, Texas 75024.

6.      Defendant Peak Capital is a Utah limited liability company with its principal place of business in Lehi, Utah. Peak Capital participated in the transaction at issue in this lawsuit.

7.      Defendant Centerstone is a California corporation with its principal place of business, upon information and belief, in Anaheim, California. Centerstone participated in the transaction at issue in this lawsuit.

8.      Defendant Garcia & Phan is a California Professional Law Corporation with its principal place of business, upon information and belief, in Huntington Beach, California. Garcia & Phan participated in the transaction at issue in this lawsuit.

9.      Defendant Olivarria is an individual who, upon information and belief, resides in Orange, California. At all relevant times, Olivarria was a Senior Escrow Officer employed by Centerstone.

10.     Defendant Phan is an individual who, upon information and belief, resides in Huntington Beach, California. Phan is an attorney at Garcia & Phan.

11.     Defendant Perea is an individual who, upon information and belief, received funds improperly transferred by Phan and may have further transferred at least some of those funds to other third parties.

12.     Defendant Salazar is an individual who, upon information and belief, resides in Laguna Hills, California. Upon information and belief, Salazar posed as a broker at Star Financial—a sister company to Lionheart Escrow, where Olivarria was employed before being terminated and moving to Centerstone—despite never having been employed by Star Financial. Salazar is in a romantic relationship with Olivarria.

13.     Defendant Marquee is a Georgia limited liability company with its principal place of business in Atlanta, Georgia. Marquee participated in the transaction at issue in this lawsuit.

14.     Defendant Vanguard is a Nevada limited liability company with its principal place of business in La Mirada, California. Vanguard participated in the transaction at issue in this lawsuit.

15.     Defendant Halperin is an individual who, upon information and belief, resides in Atlanta, Georgia. Halperin is the Managing Member of Marquee and participated in the transaction at issue in this lawsuit.

16.     Defendant Weitzman is an individual who, upon information and belief, resides in La Mirada, California. Weitzman is the Managing Member of Vanguard and participated in the transaction at issue in this lawsuit.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                          3

17. Defendant Warren is an individual who participated in the transaction at issue in this lawsuit.

18. Defendant Capson is an individual who participated in the transaction at issue in this lawsuit.

19. The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1 through 10, inclusive, are unknown to Plaintiffs at this time. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that Plaintiffs' damages were proximately caused by such Defendants.

**JURISDICTION AND VENUE**

20. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' First and Second Claims for Relief arise under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution. Plaintiffs seek damages in excess of $5,580,250.00, exclusive of interest and costs.

21. Venue is proper under 18 U.S.C. § 1965(a) because Defendants Centerstone, Olivarria, Salazar, and Garcia & Phan reside, are found, have an agent, or transact their affairs in this District.

22. This Court has personal jurisdiction over each Defendant because each Defendant transacted business in the State of California, committed tortious acts within the State of California, and/or caused injury within the State of California, in connection with the transactions and occurrences described herein. In addition, this Court may exercise personal jurisdiction over any Defendant pursuant to 18 U.S.C. § 1965(b) to the ends of justice, as it may not be possible to bring all Defendants before a single state court and the ends of justice require that other parties residing in any other district be brought before this Court.

COMPLAINT                                                        4

## GENERAL ALLEGATIONS

### The Mayfield Ranch Transaction

23. The Mayfield Ranch transaction was a purported commercial real estate acquisition of property known as Mayfield Ranch, located in Mountain Home, Elmore County, Idaho.

24. The purported buyer of Mayfield Ranch was Thunder Mountain Capital LLC, for a purchase price of $112,650,000.

25. Upon information and belief, the Manager of Thunder Mountain Capital LLC is Defendant Capson.

26. The seller entities of Mayfield Ranch were purportedly Springbok Development Inc. and related parties controlled by Jeffrey Holt.

27. The senior lender, Star Financial, had purportedly committed to a $92,000,000 loan for the real estate acquisition.

28. Defendant Marquee was to serve as a transaction coordinator and capital sourcing consultant on the deal.

29. Defendant Vanguard was to serve as a transaction coordinator and deal coordinator on the deal.

30. The gap between the senior loan and the total purchase price, approximately $57,248,561.68 in total (the "Down Payment Funding"), was to be funded through co-funder transactional capital coordinated by Peak Capital, which entered into consulting agreements with both Marquee and Vanguard, as set forth below.

31. As part of the deal, the co-funders, including Plaintiffs, were to wire their capital directly, or indirectly through Peak Capital, to Centerstone Escrow, Inc., in Anaheim, California, in connection with Escrow No. 253664-JO, pursuant to signed escrow instructions.

32. The escrow instructions contained one irrevocable instruction: hold all funds in trust and return the full repayment to Peak Capital before any funds were released to any other party.

COMPLAINT                                                                 5

33. Based on these representations and the structure of the transaction, Plaintiffs agreed to participate as co-funders.

### Plaintiffs' Participation as Co-Funders

34. On or about April 8, 2026, Plaintiff American Business Brokers entered into a Co-Funder Participation Agreement with Peak Capital, pursuant to which American Business Brokers agreed to contribute $2,000,000 to the Mayfield Ranch transaction. In consideration of American Business Brokers' contribution, Peak Capital agreed to pay American Business Brokers a consulting fee of 1.00% ($20,000), for a total return of $2,020,000.

35. On or about April 8, 2026, Plaintiff Eephus entered into a Co-Funder Participation Agreement with Peak Capital, pursuant to which Eephus agreed to contribute $2,525,000 to the Mayfield Ranch transaction. In consideration of Eephus' contribution, Peak Capital agreed to pay Eephus a consulting fee of 1.00% ($25,250), for a total return of $2,550,250.

36. On or about April 9, 2026, Plaintiff Gen 111 entered into a Co-Funder Participation Agreement with Peak Capital, pursuant to which Gen 111 agreed to contribute $275,000 to the Mayfield Ranch transaction, for a total return of $275,000.

37. On or about April 9, 2026, Plaintiff Primary Investments entered into a Co-Funder Participation Agreement with Peak Capital, pursuant to which Primary Investments agreed to contribute $500,000 to the Mayfield Ranch transaction. In consideration of Primary Investments' contribution, Peak Capital agreed to pay Primary Investments a consulting fee of 0.5% ($2,500), for a total return of $502,500.

38. On or about April 9, 2026, Plaintiff SD 2052 entered into a Co-Funder Participation Agreement with Peak Capital pursuant to which SD 2052 agreed to contribute $225,000 to the Mayfield Ranch transaction. In consideration of SD 2052's contribution, Peak Capital agreed to pay SD 2052 a consulting fee of 3.33% ($7,500), for a total return of $232,500.

39. Plaintiffs' total contributions to the Mayfield Ranch transaction were $5,525,000, with a total expected return of $5,580,250.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

40. Pursuant to the terms of its respective Co-Funder Participation Agreement, Plaintiff Eephus wired its contribution directly to Centerstone's trust account at Genesis Bank for Escrow No. 253664-JO.

41. Pursuant to the terms of their respective Co-Funder Participation Agreements, Plaintiffs American Business Brokers, Gen 111, Primary Investments, and SD 2052 wired their contributions to Peak Capital's account at Mountain America Credit Union, and Peak Capital was to consolidate those funds and wire the total amount to Centerstone.

42. Each Co-Funder Participation Agreement provided that the Total Return would be wired by Peak Capital to the respective Co-Funder's designated account on the same day that Peak Capital received the repayment wire from Centerstone following the close of the transaction.

43. Each Co-Funder Participation Agreement further provided that if the transaction failed to close for any reason, Centerstone or Peak Capital (as applicable) would return the Co-Funder's contribution in full, without fee, within two business days of receipt of the returned funds. Unbeknownst to Plaintiffs, Defendants were already taking steps to misappropriate their funds.

### Defendants' Scheme to Wrongfully Convert Plaintiffs' Funds

44. On or about April 9, 2026, Phan filed a written payment demand through Escrow No. 253664-JO, providing his client trust account wiring instructions and identifying the escrow number and amount. This demand was filed before any of the co-funders had wired their funds to Centerstone.

45. Also on or about April 9, 2026, Centerstone, acting through its Senior Escrow Officer, Defendant Olivarria, improperly initiated a wire transfer of $26,500,000—which included all or a portion of Plaintiffs' funds—from Centerstone's escrow trust account to a Wells Fargo Bank account belonging to Defendant Phan and/or Garcia & Phan (the "Wrongful Wire").

46. Centerstone expressly failed to follow the irrevocable disbursement instructions set forth in the escrow instructions.

COMPLAINT                                        7

47.     The Wells Fargo account receiving the funds was in the name of Robert Phan of Garcia & Phan, a law firm in Huntington Beach, California, who was not entitled to receive those funds.

48.     The Wrongful Wire was purportedly made on behalf of Defendant Perea, who had no authorized role in the underlying transaction.

49.     On April 11, 2026, Olivarria falsely communicated through the referral chain that Star Financial had funded its $92 million loan, when in fact Star Financial had not funded.

50.     Upon information and belief, this false messaging was coordinated by Defendant Salazar, who posed as a broker at Star Financial and is in a romantic relationship with Olivarria.

51.     For approximately five days after the Wrongful Wire was made and Plaintiffs' money was gone, Centerstone made repeated written misrepresentations claiming the underlying funds remained safely in a trust account.

52.     On April 15, 2026, Centerstone sent a fabricated disbursement tracker showing completed wire disbursements in the amount of $59,970,000, though the underlying funds had not been disbursed to the parties entitled to receive them.

53.     Phan has represented to other co-funders that he had approximately $10,000,000 of the funds from the Wrongful Wire remaining in his Wells Fargo account.

54.     Phan has also represented that he transferred $16,500,000 of the funds from the Wrongful Wire to an account belonging to Perea, and that Perea may have transferred at least some of those funds to other third parties.

55.     Centerstone claims that the Wrongful Wire was due to the actions of "rogue employee" Defendant Olivarria.

56.     This transaction is the subject of an ongoing FBI investigation.

57.     On or about May 20, 2026, Wells Fargo delivered $10,118,081.15 from the account to the federal government in compliance with a Seizure Warrant issued by the United States District Court for the Central District of California, leaving a remaining balance of $0 in the account.

COMPLAINT                                        8

**The Brokers' Improper Receipt and Retention of Consulting Fees**

58.     On or about April 9, 2026, Defendant Marquee entered into a Transaction Coordinator / Consultant Fee Agreement with Peak Capital, pursuant to which Peak Capital agreed to pay Marquee a consulting fee of $858,728.43, representing 1.500% of the total Down Payment Funding amount of $57,248,561.68.

59.     Marquee's Consultant Fee Agreement expressly provided that the consulting fee was "contingent upon: (a) the successful close of the Mayfield Ranch transaction and Peak's receipt of the full repayment wire from Centerstone Escrow, Inc." The agreement further stated: "If the Transaction fails to close for any reason, no Consulting Fee shall be payable and neither party shall have any further obligation to the other."

60.     On or about April 9, 2026, Defendant Vanguard entered into a Transaction Coordinator / Consultant Fee Agreement with Peak Capital, pursuant to which Peak Capital agreed to pay Vanguard a consulting fee of $500,924.91, representing 0.875% of the total Down Payment Funding amount of $57,248,561.68.

61.     Vanguard's Consultant Fee Agreement contained the identical condition precedent: the consulting fee was contingent upon the successful close of the transaction and Peak's receipt of the full repayment wire, and if the transaction failed to close for any reason, no fee would be payable.

62.     The Mayfield Ranch transaction did not close; Star Financial did not fund its $92 million loan. Accordingly, the conditions precedent in both Marquee's and Vanguard's fee agreements were never satisfied.

63.     Despite the express conditions precedent in their respective agreements never being satisfied, Marquee was paid $858,728.43 and Vanguard was paid $500,924.91 in consulting fees. These fees were funded from money supplied by the Mayfield Ranch co-funders (including Plaintiffs) rather than from a successful closing or from Peak Capital's repayment proceeds.

64.     Defendant Halperin is a Georgia-licensed attorney and the Managing Member of Marquee. Halperin personally signed the Consultant Fee Agreement on behalf of Marquee and

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

personally received the $858,728.43 consulting fee. Upon information and belief, Halperin spent the entirety or substantially all of those funds within 48 hours of receipt.

65.    Notably, even as Halperin retained and spent the $858,728.43 consulting fee, he personally drafted detailed transaction documents demonstrating his intimate, contemporaneous knowledge of the fraudulent scheme.

66.    On or about April 16, 2026, Halperin authored a Compliance Attorney Briefing Memorandum describing the Down Payment Funding program, the co-funder arrangements, and the specifics of the Mayfield Ranch transaction, including the identities and roles of all conspirators.

67.    On or about April 17, 2026, Halperin authored a Co-Funder Update Memorandum providing a comprehensive account of the fraud, including the collusion call, the conspirators' identities, and the movement of funds, and distributed it to all co-funding partners.

68.    Also on or about April 17, 2026, Halperin personally drafted a formal demand (it is unclear if Halperin ever sent or delivered this demand) letter to Robert Phan demanding return of the misappropriated $26,500,000, which letter detailed the precise mechanics of the fraudulent scheme, the timeline of events, and the identities and roles of all participants.

69.    Halperin thus positioned himself as an investigator of and advocate against the very fraud from which he personally profited.

70.    Defendant Weitzman is the Managing Member of Vanguard. Weitzman personally signed the Consultant Fee Agreement on behalf of Vanguard and personally received the $500,924.91 consulting fee.

71.    In a recorded telephone conversation on or about April 19, 2026, Weitzman acknowledged that the Mayfield Ranch deal was fraudulent, stated he did not want the money, and expressed willingness to return the funds. Despite this admission, Weitzman thereafter spent approximately $150,000 of the funds and failed to return the remainder.

72.    On May 12, 2026, Plaintiffs' counsel sent demand letters to both Marquee and Vanguard demanding the immediate return of the consulting fees, explaining that the fees were

never earned, were never payable under their respective agreements, and were funded from money supplied by the co-funders.

73. To date, neither Marquee nor Vanguard has returned the improperly received consulting fees to the plaintiffs or other co-funders. Vanguard has represented that they have delivered a portion of the funds to the FBI, but has retained the remainder.

74. Halperin's and Weitzman's conscious decisions to spend funds they knew were derived from a fraudulent transaction constitutes knowing participation in the conversion of Plaintiffs' property.

75. Their continued refusal to return funds that they have no contractual, equitable, or factual basis to retain raises a strong inference that they are participants in the underlying fraud, or at the very least are knowingly taking advantage of the fraudulent scheme for their own benefit.

76. Marquee and Vanguard have no contractual, equitable, or factual basis to retain the funds. The fees were paid from co-funder capital—including Plaintiffs' capital—in violation of the escrow instructions and the express conditions of Marquee's and Vanguard's own agreements.

77. Upon information and belief, Halperin is the alter ego of Marquee and used Marquee as his instrumentality, exercising complete dominion and control over the entity such that there exists a unity of interest and ownership between Halperin and Marquee.

78. Upon information and belief, Weitzman is the alter ego of Vanguard and used Vanguard as his instrumentality, exercising complete dominion and control over the entity such that there exists a unity of interest and ownership between Weitzman and Vanguard.

**The Other Individual Defendants' Personal Participation in the Scheme**

79. Upon information and belief, on or about April 9, 2026, Defendants Warren, Olivarria, Salazar, and Phan participated in a private collusion call during which Phan instructed Olivarria to wire the co-funder funds to his trust account. Olivarria complied.

80. Upon information and belief, Defendants Capson and Warren are prior criminal associates who together constructed the Mayfield Ranch transaction as a vehicle to steal co-funder capital. Warren was convicted in connection with Global Gold Exchange ("GGEX"),

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

through which he and co-defendants—including individuals connected to Capson—laundered money between 2017 and 2018, including transacting with a cartel out of Mexico.

81.    Capson is a named federal defendant in Case No. 3:19-cv-07284-EMC in the Northern District of California, a CFTC enforcement action against Denari Capital LLC.

82.    Upon information and belief, Capson personally fabricated or altered the formation documents for Thunder Mountain Capital LLC—the purported buyer entity—using Adobe Illustrator, a graphic design program with no legitimate use in editing official state entity documents. The PDF metadata of the TMC Articles of Incorporation shows that Capson personally edited the document on March 25 and March 26, 2026. Capson submitted these forged documents in connection with the Mayfield Ranch transaction.

83.    Upon information and belief, Capson used the name and identity of John Simplot—a prominent Idaho figure—without his knowledge to create a credible Idaho buyer for an Idaho land deal, constituting identity theft in furtherance of the fraudulent scheme.

84.    Upon information and belief, Warren positioned himself as the buyer's broker on the Mayfield Ranch transaction, introducing Lawrence Allende as the buyer's referral partner. Allende in turn brought the deal to Weitzman, with whom Warren—a convicted federal criminal—had a pre-existing business relationship. Weitzman then brought it to Donte Howard, who brought it to Marquee and then to Peak Capital and the co-funders. Warren thus placed himself at the top of the co-funder referral chain while simultaneously participating in the conspiracy to steal the capital that chain would generate.

## FIRST CLAIM FOR RELIEF

### (Violation of 18 U.S.C. § 1962(c) – Against All Defendants)

85.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

86.    At all relevant times, Defendants Warren, Capson, Olivarria, Phan, Salazar, Perea, Marquee, Vanguard, Halperin, Weitzman, Garcia & Phan, Centerstone, and Peak Capital were "persons" within the meaning of 18 U.S.C. § 1961(3), capable of holding a legal or beneficial interest in property.

COMPLAINT                                     12

87.    Beginning no later than early 2026, when the conspiratorial agreement among Defendants was formed, and continuing through the date of this Complaint, Defendants constituted and operated an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Enterprise"). The Enterprise consists of Warren, Capson, Olivarria, Phan, Salazar, Perea, Marquee, Vanguard, Halperin, Weitzman, Garcia & Phan, Centerstone, and Peak Capital, and functions as a continuing unit with the common purpose of misappropriating capital from co-funders, including Plaintiffs, through the fraudulent Mayfield Ranch transaction. The Enterprise's activities have not ceased: the misappropriated funds have not been returned, and Defendants Marquee and Vanguard continue to retain consulting fees derived from co-funder capital.

88.    The Enterprise is distinct from any individual Defendant. The Enterprise had an ascertainable structure with defined roles: (a) Warren and Capson served as architects and organizers who designed the fraudulent transaction, fabricated buyer entity documents, and directed the overall scheme; (b) Salazar operated the deception arm of the Enterprise by fabricating a Star Financial affiliation, transmitting forged loan documents, and relaying false funding confirmations; (c) Olivarria provided inside access to the escrow process, executed the Wrongful Wire, and made false representations to conceal the misappropriation; (d) Phan and Garcia & Phan operated the fund-diversion mechanism by filing the pre-planned payment demand, receiving the $26,500,000 Wrongful Wire into their trust account, and distributing $16,500,000 to Perea; (e) Perea served as the designated downstream recipient of diverted funds; (f) Marquee, Vanguard, Halperin, and Weitzman operated the Enterprise's co-funder recruitment pipeline by serving as transaction coordinators and capital sourcing consultants, facilitating the movement of co-funder capital into the scheme, and receiving consulting fees from co-funder capital as their share of the Enterprise's proceeds; (g) Centerstone provided the escrow infrastructure through which the Enterprise collected and diverted co-funder capital; and (h) Peak Capital served as the intermediary that consolidated co-funder contributions and transmitted them into the Enterprise's escrow mechanism.

89.    Each Defendant conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity, within the meaning of 18 U.S.C.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

§ 1962(c). The particular conduct of each Defendant in the operation or management of the Enterprise's affairs, and the predicate acts of racketeering attributable to each, identified by actor, are as follows:

90.      Defendants Warren and Capson: Warren and Capson designed and constructed the Mayfield Ranch transaction as a vehicle to misappropriate co-funder capital. Capson fabricated or altered the formation documents for Thunder Mountain Capital LLC using Adobe Illustrator on March 25 and March 26, 2026, and submitted those forged documents in connection with the transaction. Capson used the name and identity of John Simplot without his knowledge or authorization to create a credible Idaho buyer. Warren positioned himself at the top of the co-funder referral chain as the buyer's broker while concealing that he and Capson had constructed the transaction as a fraud. Warren participated in the April 9, 2026 collusion call during which Phan instructed Olivarria to wire the co-funder funds to his trust account. Warren and Capson are prior criminal associates: Warren was convicted in connection with Global Gold Exchange ("GGEX"), through which he and co-defendants—including individuals connected to Capson—laundered money between 2017 and 2018, including transacting with a cartel out of Mexico. Capson is a named federal defendant in Case No. 3:19-cv-07284-EMC, a CFTC enforcement action. Warren and Capson directed and managed the Enterprise's affairs by designing its fraudulent transaction structure, fabricating the documents necessary to give it the appearance of legitimacy, and directing the theft of co-funder capital.

91.      Defendant Salazar: Beginning in or about late March 2026, Salazar represented to Kyle Pierce of Peak Capital and, through the co-funder referral chain, to Plaintiffs and the other co-funders, that he was a broker and Director of Operations for Star Financial and that Star Financial had issued a $92,000,000 conditional loan approval for the Mayfield Ranch transaction. To lend those representations the appearance of legitimacy, Salazar transmitted Star Financial loan documents dated March 20, 2026, bearing Star Financial letterhead and his email address, osalazar@starfincorp.com. On or about April 11, 2026, Salazar caused the false message that Star Financial had funded its $92,000,000 loan to be communicated through the referral chain. Each of these representations was false: Star Financial never employed Salazar, is not licensed in Idaho,

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

never issued or funded the purported loan, and the loan documents were fabricated. Salazar conducted the Enterprise's affairs by operating its deception arm—fabricating lender credentials and loan documents, and relaying false funding confirmations—without which the Enterprise could not have induced co-funders to wire and maintain their capital in escrow.

92.    Defendants Olivarria and Centerstone: On or about April 9, 2026, Olivarria, acting as Centerstone's Senior Escrow Officer assigned to Escrow No. 253664-JO, improperly initiated the Wrongful Wire of $26,500,000 (including all or a portion of Plaintiffs' funds) from Centerstone's escrow trust account to a Wells Fargo Bank account belonging to Phan and/or Garcia & Phan. Olivarria participated in the April 9, 2026 collusion call during which Phan instructed her to wire the co-funder funds to his trust account, and she complied. On or about April 11, 2026, and repeatedly for approximately five days thereafter, Olivarria represented in writing, through the referral chain, that Star Financial had funded its $92,000,000 loan and that the co-funders' funds remained safely held in Centerstone's trust account. On April 15, 2026, Centerstone, acting through an employee identified as "Anthony," sent a fabricated disbursement tracker reflecting $59,970,000 in completed wire disbursements, when in truth those funds had not been disbursed to the parties entitled to receive them. Olivarria and Centerstone conducted the Enterprise's affairs by providing the escrow infrastructure through which co-funder capital was collected, executing the Wrongful Wire that diverted that capital, and making repeated false representations to conceal the misappropriation.

93.    Defendants Phan, Garcia & Phan, and Perea: On or about April 9, 2026, Phan filed a written payment demand through Escrow No. 253664-JO on behalf of Perea, representing that Perea was entitled to receive the escrowed funds and providing Garcia & Phan client trust account wiring instructions. That demand was part of the pre-planned scheme to divert co-funder capital. Upon receiving the $26,500,000 Wrongful Wire into the Garcia & Phan Wells Fargo trust account, Phan transferred $16,500,000 to Perea and retained approximately $10,000,000. Upon information and belief, Perea further transferred at least some of those funds to other third parties. Phan instructed Olivarria during the April 9, 2026 collusion call to wire the funds to his trust account. Phan, Garcia & Phan, and Perea conducted the Enterprise's affairs by operating its fund-

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

diversion mechanism—filing the pre-planned demand that triggered the Wrongful Wire, receiving $26,500,000 in diverted co-funder capital, and layering the proceeds through downstream transfers.

94.    Defendants Marquee, Vanguard, Halperin, and Weitzman: Marquee and Vanguard served as "transaction coordinators" and "capital sourcing consultants" on the Mayfield Ranch transaction. Weitzman sat in the middle of the co-funder referral chain: Warren introduced Lawrence Allende as the buyer's referral partner; Allende brought the deal to Weitzman; Weitzman brought it to Donte Howard; Howard brought it to Marquee; and Marquee and Halperin brought it to Peak Capital and the co-funders. Marquee and Vanguard thus operated the Enterprise's co-funder recruitment pipeline—the mechanism by which the Enterprise sourced the capital it intended to steal. On or about April 15, 2026, Centerstone's fabricated disbursement tracker was transmitted to co-funder representative Aaron Weitzman, who relayed it to Plaintiffs and the other co-funders, thereby furthering the Enterprise's concealment of the misappropriation. On or about April 9, 2026, Marquee was paid $858,728.43 and Vanguard was paid $500,924.91 in consulting fees funded from co-funder capital—including Plaintiffs' capital—despite the express condition precedent to payment (successful closing) never being satisfied. Halperin received and spent the entirety or substantially all of the Marquee consulting fee within 48 hours of receipt while simultaneously demonstrating intimate, contemporaneous knowledge of the fraud by authoring a Compliance Attorney Briefing Memorandum (April 16, 2026), a Co-Funder Update Memorandum (April 17, 2026), and a formal demand letter to Phan (April 17, 2026), each detailing the precise mechanics of the scheme, the conspirators' identities, and the movement of funds. Weitzman acknowledged in a recorded telephone conversation on or about April 19, 2026 that the Mayfield Ranch deal was fraudulent, yet thereafter spent approximately $150,000 of the Vanguard consulting fee. Marquee, Vanguard, Halperin, and Weitzman conducted the Enterprise's affairs by operating its investor-facing recruitment pipeline, transmitting false information to co-funders, and receiving and retaining consulting fees drawn from co-funder capital as their share of the Enterprise's proceeds.

95.    Defendant Peak Capital: Peak Capital entered into Co-Funder Participation Agreements with Plaintiffs and other co-funders, collected their contributions, consolidated those funds, and transmitted them to Centerstone's escrow account, where the Enterprise diverted them. Peak Capital also entered into consulting agreements with Marquee and Vanguard pursuant to which co-funder capital was paid to those entities as consulting fees despite the condition precedent to payment never being satisfied. Peak Capital conducted the Enterprise's affairs by serving as the intermediary that aggregated co-funder capital and channeled it into the Enterprise's escrow mechanism for diversion.

96.    The pattern of racketeering activity through which Defendants conducted the Enterprise's affairs consisted of multiple predicate acts within the meaning of 18 U.S.C. § 1961(1) and (5), including acts of wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), money laundering (18 U.S.C. § 1956), and fraud in connection with identification documents (18 U.S.C. § 1028). These predicate acts include, but are not limited to, the following:

97.    Wire Fraud (18 U.S.C. § 1343): (a) On or about April 9, 2026, Olivarria, at Phan's instruction, initiated a wire transfer of $26,500,000 (including all or a portion of Plaintiffs' funds) from Centerstone's escrow trust account at Genesis Bank in Anaheim, California, to a Wells Fargo Bank account belonging to Phan and/or Garcia & Phan, in furtherance of the scheme to defraud; (b) on or about April 8–9, 2026, Plaintiffs wired their contributions totaling $5,525,000 across state lines to Peak Capital's account at Mountain America Credit Union and to Centerstone's trust account at Genesis Bank, induced by Defendants' fraudulent representations that the Mayfield Ranch transaction was legitimate and that funds would be held in trust; (c) Phan caused approximately $16,500,000 to be transferred by wire from his Wells Fargo account to an account belonging to Perea, and Perea further transferred at least some of those funds to other third parties by wire; (d) on or about April 15, 2026, Centerstone caused a fabricated disbursement tracker to be transmitted electronically to co-funder representative Weitzman, who relayed it to Plaintiffs and other co-funders, falsely showing $59,970,000 in completed wire disbursements; and (e) beginning in or about late March 2026, Salazar transmitted by electronic

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

means fabricated Star Financial loan documents bearing forged letterhead to induce Plaintiffs to wire their capital into escrow.

98.    Mail Fraud (18 U.S.C. § 1341): (a) On or about April 9, 2026, Phan filed a written payment demand through Escrow No. 253664-JO providing his client trust account wiring instructions, transmitted through the mails or by interstate carrier; (b) on or about April 11, 2026 and for approximately five days thereafter, Olivarria caused written misrepresentations to be transmitted through the referral chain, including through interstate communications, falsely stating that Star Financial had funded its $92,000,000 loan and that co-funders' funds remained safely in trust; (c) in or about late March 2026, Salazar caused fabricated Star Financial loan documents dated March 20, 2026 to be transmitted to Kyle Pierce of Peak Capital and through the referral chain, via the mails or interstate carrier; and (d) on or about April 16–17, 2026, Halperin transmitted through the mails or interstate carrier a Compliance Attorney Briefing Memorandum and a Co-Funder Update Memorandum to co-funding partners, demonstrating his intimate knowledge of the fraudulent scheme while he retained his consulting fee derived from co-funder capital.

99.    Money Laundering (18 U.S.C. § 1956): (a) On or about April 9, 2026, the $26,500,000 Wrongful Wire from Centerstone's escrow trust account to the Garcia & Phan Wells Fargo trust account constituted a financial transaction involving the proceeds of specified unlawful activity (wire fraud and mail fraud), which transaction was designed to conceal the nature, location, source, ownership, and control of such proceeds; (b) Phan's subsequent transfer of approximately $16,500,000 from the Wells Fargo account to Perea's account constituted a further financial transaction involving the proceeds of specified unlawful activity, designed to layer and conceal the stolen funds; (c) upon information and belief, Perea's further transfers of at least some of those funds to other third parties constituted additional financial transactions involving proceeds of specified unlawful activity; and (d) the payment of consulting fees of $858,728.43 to Marquee/Halperin and $500,924.91 to Vanguard/Weitzman from co-funder capital constituted financial transactions involving the proceeds of specified unlawful activity, which proceeds Halperin and Weitzman knew were derived from a fraudulent scheme.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                                        18

100. Fraud in Connection with Identification Documents (18 U.S.C. § 1028): (a) On or about March 25–26, 2026, Capson fabricated or altered the formation documents for Thunder Mountain Capital LLC using Adobe Illustrator, a graphic design program with no legitimate use in editing official state entity documents, and submitted those forged documents in connection with the Mayfield Ranch transaction; and (b) Capson used the name and identity of John Simplot—a prominent Idaho figure—without his knowledge or authorization to create a credible Idaho buyer for the Idaho land deal, constituting identity theft in furtherance of the fraudulent scheme.

101. The predicate acts described above constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) because they are related and continuous. The predicate acts are related because they share the same or similar purposes (misappropriating co-funder capital), participants (the members of the Enterprise), victims (Plaintiffs and other co-funders), and methods (fabrication of documents, false representations, improper wire transfers, and layered movement of stolen funds).

102. The predicate acts are continuous because the Enterprise's conduct, by its nature, projects a threat of repetition into the future. Warren and Capson are prior criminal associates who previously engaged in money laundering through Global Gold Exchange between 2017 and 2018. Capson is a named federal defendant in a CFTC enforcement action. The Enterprise was not organized around a discrete contractual dispute but rather constituted a criminal operation run by repeat offenders whose documented history of fraud demonstrates that the Mayfield Ranch transaction was one instance of an ongoing pattern of criminal conduct. The nature of the Enterprise—a coordinated group with defined roles for fabricating transactions, recruiting investor capital, diverting funds, and laundering proceeds—is inherently projectable into future similar schemes.

103. Alternatively, the predicate acts demonstrate closed-ended continuity because the scheme involved numerous predicate acts committed by multiple participants over a period extending from no later than early 2026, when the conspiratorial agreement was formed and preparatory acts began, through at least May 2026, when the FBI executed a seizure warrant—

COMPLAINT 19

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

and the scheme's consequences continue to the present, as the misappropriated funds have not been returned and Defendants continue to retain the proceeds of their racketeering activity. The scheme targeted multiple victims (five Plaintiff entities and additional co-funders), involved the theft of tens of millions of dollars, and required a high degree of planning and coordination.

104.    As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs' injuries include the loss of $5,525,000 in contributed capital and $55,250 in expected consulting fees, together with lost investment opportunities and other consequential damages resulting from Plaintiffs' inability to use the stolen funds. These injuries were directly and proximately caused by the pattern of racketeering activity described above.

105.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the damages they have sustained, together with costs of suit and reasonable attorneys' fees.

106.    WHEREFORE, Plaintiffs pray for judgment against all Defendants in an amount to be proved at trial, but in no event less than three times Plaintiffs' actual damages of $5,580,250, together with reasonable attorneys' fees, costs of suit, and pre- and post-judgment interest.

## SECOND CLAIM FOR RELIEF

**(Violation of 18 U.S.C. § 1962(d) – In the Alternative, Against All Defendants)**

107.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

108.    In the alternative to the First Claim for Relief, and to the extent any Defendant is found not to have participated in the operation or management of the Enterprise's affairs within the meaning of 18 U.S.C. § 1962(c), each Defendant conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

109.    Each Defendant agreed to participate, directly or indirectly, in the conduct of the Enterprise's affairs through a pattern of racketeering activity. Each Defendant was aware of the essential nature and scope of the Enterprise and intended to participate in it. The particular facts demonstrating each Defendant's knowledge and agreement are as follows:

COMPLAINT                                    20

110.    <u>Defendants Warren and Capson</u>: Warren and Capson agreed to facilitate the Enterprise's racketeering objectives by designing the fraudulent Mayfield Ranch transaction from its inception, fabricating buyer entity documents, and directing the theft of co-funder capital. Their agreement is demonstrated by their coordinated actions in constructing the scheme, their participation in the April 9, 2026 collusion call, and their documented history as prior criminal associates in the GGEX money-laundering operation.

111.    <u>Defendant Salazar</u>: Salazar agreed to facilitate the Enterprise's racketeering objectives by fabricating a Star Financial affiliation, transmitting forged loan documents, and relaying false funding confirmations. His agreement is demonstrated by the pre-planned nature of his false representations, which began before any co-funder money was wired, and by his coordination with Olivarria in relaying the false April 11, 2026 funding message. Salazar's romantic relationship with Olivarria further evidences the personal connections underlying the conspiratorial agreement.

112.    <u>Defendants Olivarria and Centerstone</u>: Olivarria agreed to facilitate the Enterprise's racketeering objectives by participating in the April 9, 2026 collusion call, executing the Wrongful Wire at Phan's instruction, and making repeated false representations to conceal the misappropriation. Her agreement is demonstrated by her participation in the collusion call—a pre-arranged coordination among conspirators—and by her subsequent affirmative concealment of the theft for approximately five days. Centerstone, through Olivarria as its Senior Escrow Officer, agreed to facilitate the scheme by providing the escrow infrastructure and transmitting the fabricated disbursement tracker.

113.    <u>Defendants Phan, Garcia & Phan, and Perea</u>: Phan agreed to facilitate the Enterprise's racketeering objectives by filing the pre-planned payment demand on April 9, 2026, and by participating in the collusion call during which he instructed Olivarria to wire the funds to his trust account. The pre-planned nature of Phan's demand, filed the same day the escrow agreement was signed and before any co-funder contributed, conclusively demonstrates prior agreement. Garcia & Phan provided its trust account as the designated landing zone for the diverted funds. Perea agreed to participate as the downstream fund recipient, as demonstrated by

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

Phan's filing of the payment demand on Perea's behalf and Perea's subsequent receipt and further transfer of $16,500,000.

114. <u>Defendants Marquee, Vanguard, Halperin, and Weitzman</u>: Marquee, Vanguard, Halperin, and Weitzman agreed to facilitate the Enterprise's racketeering objectives by operating the co-funder recruitment pipeline, facilitating the movement of co-funder capital into the scheme, relaying false information to co-funders, and receiving consulting fees from co-funder capital as their share of the Enterprise's proceeds. Their knowledge of the essential nature and scope of the Enterprise is demonstrated by: (a) Halperin's authorship of a Compliance Attorney Briefing Memorandum (April 16, 2026) and a Co-Funder Update Memorandum (April 17, 2026), each detailing the identities of all conspirators, the mechanics of the fraud, and the movement of funds; (b) Halperin's drafting of a formal demand letter to Phan (April 17, 2026) detailing the precise mechanics of the scheme; (c) Weitzman's recorded acknowledgment on or about April 19, 2026 that the Mayfield Ranch deal was fraudulent; (d) Halperin's conscious decision to spend the entirety or substantially all of the $858,728.43 consulting fee within 48 hours of receipt despite his documented knowledge of the fraud; and (e) Weitzman's conscious decision to spend approximately $150,000 of the $500,924.91 consulting fee despite his recorded admission that the deal was fraudulent. Their continued refusal to return funds derived from the Enterprise's racketeering activity, despite written demands, further evidences their agreement to facilitate the Enterprise's objectives.

115. <u>Defendant Peak Capital</u>: Peak Capital agreed to facilitate the Enterprise's racketeering objectives by serving as the intermediary that aggregated co-funder capital through Co-Funder Participation Agreements and channeled those funds to Centerstone's escrow account. Peak Capital also entered into consulting agreements with Marquee and Vanguard and caused co-funder capital to be paid to those entities despite the condition precedent to payment never being satisfied.

116. As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property within the meaning of 18 U.S.C. § 1964(c). Plaintiffs' injuries include the loss of $5,525,000 in contributed capital and

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                      22

$55,250 in expected consulting fees, together with lost investment opportunities and other consequential damages resulting from Plaintiffs' inability to use the stolen funds. These injuries were directly and proximately caused by the conspiracy and the overt acts committed in furtherance thereof.

117.   Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the damages they have sustained, together with costs of suit and reasonable attorneys' fees.

118.   WHEREFORE, Plaintiffs pray for judgment against all Defendants in an amount to be proved at trial, but in no event less than three times Plaintiffs' actual damages of $5,580,250, together with reasonable attorneys' fees, costs of suit, and pre- and post-judgment interest.

**THIRD CLAIM FOR RELEF**

**(Breach of Contract – Against Peak Capital)**

119.   Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

120.   Each of the Co-Funder Participation Agreements between Plaintiffs and Peak Capital is a binding and enforceable contract.

121.   Plaintiffs complied with their respective obligations under the terms of their Agreements by wiring their contributions as directed.

122.   Peak Capital is in material breach of each Agreement for, among other things: (a) failure to pay Plaintiffs' Total Returns when due; (b) failure to ensure the underlying transaction was legitimate; (c) failure to ensure the underlying transaction took place as promised; and (d) failure to return Plaintiffs' contributions after the transaction failed to close.

123.   Peak Capital's breaches of contract have injured and damaged Plaintiffs in the form of lost funds and lost returns on those funds.

124.   Plaintiffs have suffered, and continue to suffer, both direct and consequential damages as a result of Peak Capital's breaches of contract in an amount to be proved at trial, but in no event less than $5,580,250, plus pre- and post-judgment interest.

COMPLAINT                                    23

125. Each Co-Funder Participation Agreement provides that the prevailing party in any action to enforce the Agreement shall be entitled to recover reasonable attorneys' fees and costs at all levels of proceeding. Plaintiffs have been required to retain attorneys to pursue repayment of the obligations owed under their Agreements and are entitled to an award of their attorneys' fees.

126. WHEREFORE, Plaintiffs pray for judgment against Peak Capital in an amount to be proved at trial, but in no event less than $5,580,250, plus attorneys' fees, costs, and pre- and post-judgment interest.

## FOURTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty – Against Centerstone)

127. Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

128. As an escrow company that accepted Plaintiffs' funds (directly or indirectly through Peak Capital), Centerstone owed fiduciary duties to Plaintiffs, including a duty of loyalty, a duty to ensure strict compliance with escrow instructions, and a duty to ensure Plaintiffs' funds were not distributed improperly.

129. Centerstone breached these fiduciary duties when it caused $26,500,000, including Plaintiffs' funds, to be transferred via the Wrongful Wire to the Wells Fargo account belonging to Phan/Garcia & Phan, and when it subsequently made repeated misrepresentations about the status of the funds.

130. Centerstone's breaches of fiduciary duty have materially injured and damaged Plaintiffs.

131. Plaintiffs have suffered, and continue to suffer, both direct and consequential damages as a result of Centerstone's breaches of fiduciary duty in an amount to be proved at trial, but in no event less than $5,525,000. Plaintiffs' consequential damages include, but are not limited to, lost investment opportunities and other damages resulting from Plaintiffs' inability to use the stolen funds.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

132.    Centerstone's breaches of fiduciary duty were deliberate, intentional, and/or committed with reckless disregard for the rights of Plaintiffs. As such, Plaintiffs are entitled to an award of punitive damages in an amount to be proved at trial.

133.    WHEREFORE, Plaintiffs pray for judgment against Centerstone in an amount to be proved at trial, but in no event less than $5,525,000, plus punitive damages, costs, and pre- and post-judgment interest.

## FIFTH CLAIM FOR RELIEF

### (Negligence – Against Centerstone)

134.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

135.    As an escrow company that accepted Plaintiffs' funds (directly or indirectly through Peak Capital), Centerstone owed a duty of reasonable care to Plaintiffs, including a duty to exercise reasonable care in handling Plaintiffs' funds, a duty to verify wire instructions before transferring funds, and a duty to ensure Plaintiffs' funds were not distributed improperly.

136.    Centerstone breached its duty of care when it negligently caused $26,500,000, including Plaintiffs' funds, to be transferred via the Wrongful Wire to the Wells Fargo account belonging to Phan/Garcia & Phan, and when it subsequently made repeated misrepresentations about the status of the funds.

137.    Centerstone's negligence has materially injured and damaged Plaintiffs.

138.    Plaintiffs have suffered, and continue to suffer, both direct and consequential damages as a result of Centerstone's negligence in an amount to be proved at trial, but in no event less than $5,525,000. Plaintiffs' consequential damages include, but are not limited to, lost investment opportunities and other damages resulting from Plaintiffs' inability to use the stolen funds.

139.    Centerstone's negligence was gross, wanton, and/or committed with reckless disregard for the rights of Plaintiffs. As such, Plaintiffs are entitled to an award of punitive damages in an amount to be proved at trial.

COMPLAINT                                25

140.    WHEREFORE, Plaintiffs pray for judgment against Centerstone in an amount to be proved at trial, but in no event less than $5,525,000, plus punitive damages, costs, and pre- and post-judgment interest.

### SIXTH CLAIM FOR RELIEF
**(Conversion – Against Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, Weitzman, Warren, and Capson)**

141.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

142.    Garcia & Phan and Phan have willfully, wrongfully, and without lawful justification taken control of funds rightfully belonging to Plaintiffs, to wit, $5,525,000 or a portion thereof.

143.    Upon information and belief, Perea has willfully, wrongfully, and without lawful justification taken control of funds rightfully belonging to Plaintiffs, or a portion thereof, having received at least $16,500,000 from Phan.

144.    Marquee and Halperin have willfully, wrongfully, and without lawful justification taken control of $858,728.43 in funds that were derived from Plaintiffs' contributions and the contributions of other co-funders, and which Marquee and Halperin had no contractual or legal right to receive given that the condition precedent to payment—the successful closing of the transaction—was never satisfied.

145.    Despite being personally aware of the fraud, Halperin received and dissipated these funds within 48 hours of receipt.

146.    Vanguard and Weitzman have willfully, wrongfully, and without lawful justification taken control of $500,924.91 in funds that were derived from Plaintiffs' contributions and the contributions of other co-funders, and which Vanguard and Weitzman had no contractual or legal right to receive given that the condition precedent to payment—the successful closing of the transaction—was never satisfied.

147.    Despite acknowledging in a recorded conversation that the transaction was fraudulent and that he did not want the money, Weitzman thereafter spent approximately $150,000 of the funds and has failed to return the remainder.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                    26

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

148. Despite written demands made on May 12, 2026, both Marquee and Vanguard have refused to return the improperly received consulting fees.

149. Warren and Capson, as co-architects of the fraudulent scheme, have willfully, wrongfully, and without lawful justification caused the conversion of Plaintiffs' funds by constructing the Mayfield Ranch transaction as a vehicle to misappropriate co-funder capital, fabricating buyer entity documents, and otherwise facilitating the theft of funds rightfully belonging to Plaintiffs.

150. Warren further participated in the collusion call that directed the Wrongful Wire.

151. As a result of Defendants' conversion, Plaintiffs have been wrongfully denied the possession and use of their funds. Defendants have wrongfully exercised dominion and control over personal property in violation of the rights of Plaintiffs.

152. Plaintiffs have suffered, and continue to suffer, both direct and consequential damages as a result of Defendants' conversion in an amount to be proved at trial, but in no event less than $5,525,000. Plaintiffs' consequential damages include, but are not limited to, lost investment opportunities and other damages resulting from Plaintiffs' inability to use the stolen funds.

153. Defendants' conversion was deliberate, intentional, and/or committed with reckless disregard for the rights of Plaintiffs. As such, Plaintiffs are entitled to an award of punitive damages in an amount to be proved at trial.

154. WHEREFORE, Plaintiffs pray for judgment against Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, Weitzman, Warren, and Capson, in an amount to be proved at trial, but in no event less than $5,525,000, plus punitive damages, costs, and pre- and post-judgment interest.

### SEVENTH CLAIM FOR RELIEF
**(Tortious Interference with Contract – Against Olivarria, Phan, Salazar, Marquee, Vanguard, Halperin, Weitzman, Warren, and Capson)**

155. Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

COMPLAINT                                                          27

156. Each of Plaintiffs' Co-Funder Participation Agreements with Peak Capital is a valid, binding, and enforceable contract.

157. As an employee of Centerstone and the individual tasked with initiating wire transfers, Olivarria had knowledge of the Co-Funder Participation Agreements and the escrow instructions.

158. Upon information and belief, Phan had knowledge of the Agreements, as he filed a written payment demand through Escrow No. 253664-JO for the co-funder funds before any of the co-funders had wired their contributions.

159. Olivarria intentionally acted with improper means and for an improper purpose to induce a breach or make performance of the Agreements impossible by initiating the Wrongful Wire of $26,500,000, including Plaintiffs' funds, from the escrow account to Phan's Wells Fargo account.

160. Phan intentionally acted with improper means and for an improper purpose to induce a breach or make performance of the Agreements impossible by filing the written payment demand through Escrow No. 253664-JO for the $26,500,000, including Plaintiffs' funds.

161. Upon information and belief, Salazar intentionally acted to interfere with the Agreements by coordinating false communications that Star Financial had funded its loan, thereby inducing co-funders to maintain their positions in the transaction while the Wrongful Wire was being executed.

162. Upon information and belief, Marquee, Vanguard, Halperin, and Weitzman, as transaction coordinators intimately involved in the deal structure, had knowledge of the Co-Funder Participation Agreements and the escrow instructions. Their roles as coordinators and capital sourcing consultants gave them access to the details of the transaction and the obligations owed to co-funders. By accepting payment of their consulting fees from co-funder capital before the transaction closed—and thereafter refusing to return those fees—Marquee, Vanguard, Halperin, and Weitzman have intentionally interfered with Plaintiffs' contractual rights to receive return of their contributions.

163.    Upon information and belief, Warren and Capson intentionally acted to interfere with the Co-Funder Participation Agreements by constructing the fraudulent transaction, fabricating buyer entity documents, and otherwise facilitating the theft of funds that made performance of the Agreements impossible. Warren further participated in the collusion call that directed the Wrongful Wire.

164.    Plaintiffs have suffered, and continue to suffer, both direct and consequential damages as a result of Defendants' tortious interference in an amount to be proved at trial, but in no event less than $5,580,250.

165.    WHEREFORE, Plaintiffs pray for judgment against Olivarria, Phan, Salazar, Marquee, Vanguard, Halperin, Weitzman, Warren, and Capson, in an amount to be proved at trial, but in no event less than $5,580,250, plus punitive damages, costs, and pre- and post-judgment interest.

## EIGHTH CLAIM FOR RELIEF

### (Fraud – Against All Defendants)

166.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

167.    Defendants made or participated in making representations of material fact to Plaintiffs and other co-funders, including but not limited to: (a) that the Mayfield Ranch transaction was a legitimate commercial real estate acquisition; (b) that funds wired to Centerstone would be held in trust and returned pursuant to the irrevocable escrow instructions; (c) that Star Financial had funded its $92 million loan; and (d) that disbursements had been made to the proper parties.

168.    These representations were false. The Mayfield Ranch transaction, as structured, was a vehicle to misappropriate co-funder capital. Star Financial never funded its loan. The funds were not held in trust as promised but were improperly wired to Phan's Wells Fargo account. The disbursement tracker was fabricated. The particular false representations and concealments attributable to each Defendant, identified by speaker, are as follows:

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                    29

169.   Defendant Salazar: Beginning in or about late March 2026, Salazar represented to Kyle Pierce of Peak Capital and, through the co-funder referral chain, to Plaintiffs and the other co-funders, that he was a broker and Director of Operations for Star Financial, the purported senior lender, and that Star Financial had issued a $92,000,000 conditional loan approval for the Mayfield Ranch transaction. To lend those representations the appearance of legitimacy, Salazar transmitted Star Financial loan documents dated March 20, 2026, bearing Star Financial letterhead and his email address, osalazar@starfincorp.com. On or about April 11, 2026, Salazar caused the false message that Star Financial had funded its $92,000,000 loan to be communicated through the referral chain, passing from Olivarria to Lawrence Allende to Aaron Weitzman to Kyle Pierce to Craig Halperin. Each of these representations was false: Star Financial never employed Salazar, is not licensed in Idaho, never issued or funded the purported loan, and the loan documents were fabricated. Salazar made these representations to induce Plaintiffs and the other co-funders to wire their capital into escrow and to leave it there.

170.   Defendant Olivarria: On or about April 11, 2026, and repeatedly for approximately five days thereafter, Olivarria—Centerstone's Senior Escrow Officer assigned to Escrow No. 253664-JO—represented in writing, through the referral chain to Plaintiffs and the other co-funders, that Star Financial had funded its $92,000,000 loan and that the co-funders' funds remained safely held in Centerstone's trust account. These representations were false: Star Financial had not funded, and Olivarria had already initiated the April 9, 2026 wire of $26,500,000 out of the trust account to Phan. Olivarria made these representations to conceal the misappropriation and to induce Plaintiffs to refrain from demanding the immediate return of their funds.

171.   Defendant Centerstone: On or about April 15, 2026 at 10:37 a.m., Centerstone, acting through an employee identified as "Anthony," sent a fabricated disbursement tracker to co-funder representative Aaron Weitzman reflecting $59,970,000 in completed wire disbursements, when in truth those funds had not been disbursed to the parties entitled to receive them and a substantial portion had already been diverted through the Wrongful Wire. The fabricated tracker

COMPLAINT                                                      30

was relayed to Plaintiffs and the other co-funders for the purpose of concealing the misappropriation and forestalling demands for the return of their funds.

172.   Defendants Phan and Garcia & Phan: On or about April 9, 2026—the same day the escrow agreement was signed and before any co-funder had wired a single dollar—Phan filed a written payment demand through Escrow No. 253664-JO on behalf of Defendant Perea, representing that Perea was entitled to receive the escrowed funds in satisfaction of a purported debt owed to Perea by Warren and providing Garcia & Phan client trust account wiring instructions. That representation was false and was made as part of the pre-planned scheme to divert the co-funders' capital; Perea had no legitimate interest in the escrowed funds, which belonged to Plaintiffs and the other co-funders and were required to be held in trust. After receiving the $26,500,000 Wrongful Wire, Phan represented that he was preserving the funds even as he transferred $16,500,000 to Perea and retained approximately $10,000,000.

173.   Defendant Capson: Capson, the Manager of the purported buyer Thunder Mountain Capital LLC, fabricated or altered the buyer entity's official formation documents, personally editing the Articles of Incorporation on March 25 and March 26, 2026 using Adobe Illustrator—a graphic-design program with no legitimate use in editing official state entity records, as confirmed by the documents' PDF metadata—and submitted those forged documents in connection with the transaction. Capson further used the name and identity of John Simplot, a prominent Idaho figure, without his knowledge or authorization, to create a credible Idaho buyer for an Idaho land deal. Through these forged documents, Capson represented that Thunder Mountain Capital LLC was a bona fide buyer with the genuine intent and capacity to close, which representation was false and was made to induce Plaintiffs and the other co-funders to fund the transaction.

174.   Defendant Warren: Warren positioned himself at the top of the co-funder referral chain as the buyer's broker and represented the Mayfield Ranch transaction to be a legitimate acquisition, while knowingly concealing that he and Capson—his prior criminal associate from the Global Gold Exchange money-laundering operation—had constructed the transaction as a vehicle to misappropriate co-funder capital. Warren also participated in the April 9, 2026

COMPLAINT                                                    31

collusion call during which Phan instructed Olivarria to wire the co-funder funds to his trust account. Warren's affirmative representations and his material omissions were made to induce Plaintiffs and the other co-funders to fund the transaction.

175. Upon information and belief, Defendants knew these representations were false when made, or made them recklessly and without regard for their truth or falsity.

176. Defendants made these representations with the intent to induce Plaintiffs to wire their contributions and/or to refrain from demanding the immediate return of their funds.

177. Plaintiffs reasonably relied on Defendants' representations in wiring their contributions and in refraining from seeking immediate return of their funds.

178. Additionally, with respect to Marquee, Vanguard, Halperin, and Weitzman: upon information and belief, Marquee, Vanguard, Halperin, and Weitzman, as transaction coordinators intimately involved in the deal, knew or should have known that the transaction was fraudulent, and their acceptance of consulting fees paid from co-funder capital before closing—and their continued retention of those fees after the fraud was exposed—constitutes participation in the fraudulent scheme. Their refusal to return funds despite demand raises a strong inference of knowing participation in the fraud. Halperin spent the entirety or substantially all of the Marquee consulting fee within 48 hours of receipt. Weitzman acknowledged in a recorded conversation that the deal was fraudulent yet thereafter spent approximately $150,000 of the Vanguard consulting fee.

179. With respect to Warren and Capson: upon information and belief, Warren and Capson constructed the Mayfield Ranch transaction as a fraudulent scheme from its inception. Warren participated in the collusion call directing the theft of funds and has a prior federal criminal conviction for money laundering through GGEX. Capson fabricated the buyer entity's formation documents, used John Simplot's identity without authorization, and is a prior federal defendant in a CFTC enforcement action. Warren and Capson are prior criminal associates whose documented pattern of fraud demonstrates that the Mayfield Ranch transaction was designed to misappropriate co-funder capital.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                                    32

180.    As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered both direct and consequential damages in an amount to be proved at trial, but in no event less than $5,525,000. Plaintiffs' consequential damages include, but are not limited to, lost investment opportunities and other damages resulting from Plaintiffs' inability to use the stolen funds.

181.    Defendants' conduct was willful, oppressive, fraudulent, and malicious, entitling Plaintiffs to an award of punitive damages.

182.    WHEREFORE, Plaintiffs pray for judgment against all Defendants, in an amount to be proved at trial, but in no event less than $5,525,000, plus punitive damages, costs, and pre- and post-judgment interest.

## NINTH CLAIM FOR RELIEF

### (Civil Conspiracy – Against All Defendants)

183.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

184.    Defendants conspired together for the objective of improperly and unlawfully converting Plaintiffs' and other co-funders' funds for their own use and benefit.

185.    Upon information and belief, Defendants further agreed that the course of action to accomplish that objective would include:

a.    To construct the Mayfield Ranch deal as a vehicle to misappropriate Plaintiffs' and other co-funders' capital;

b.    To use Salazar's false claim of affiliation with Star Financial to provide the appearance of inside lender access needed to make the transaction appear legitimate and to falsely represent that Star Financial had funded the loan;

c.    For Olivarria to initiate the request to improperly send the funds to Phan's Wells Fargo account;

d.    For Phan to receive and transfer the funds to Perea and potentially other co-conspirators;

e.    For Marquee, Vanguard, Halperin, and Weitzman, as deal coordinators and capital sourcing consultants, to facilitate the recruitment of co-funders and the movement

COMPLAINT                                                      33

of funds, and to receive consulting fees from co-funder capital as their share of the proceeds of the conspiracy; and

    f.   For Warren and Capson to construct the fraudulent transaction from inception, fabricate buyer entity documents, and use stolen identities to give the deal false credibility, and for Warren to participate in the collusion call directing the theft of co-funder funds.

186.   Defendants' actions of inducing Plaintiffs to provide funding for the Mayfield Ranch deal and converting Plaintiffs' funds were unlawful and covert.

187.   As a direct and proximate result of Defendants' unlawful, overt actions in furtherance of their conspiracy, Plaintiffs have suffered and continue to suffer damages in an amount to be proved at trial, but in no event less than $5,525,000.

188.   WHEREFORE, Plaintiffs pray for judgment against all Defendants, in an amount to be proved at trial, but in no event less than $5,525,000, including compensatory, consequential, incidental, and punitive damages, together with attorneys' fees, interest, and costs of suit, and such other relief as this Court deems just and equitable.

## TENTH CLAIM FOR RELIEF

### (Unjust Enrichment – Against All Defendants)

189.   Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

190.   Plaintiffs conferred benefits upon Defendants by advancing a total of $5,525,000 in connection with the Mayfield Ranch transaction.

191.   Defendants knowingly and willingly accepted, utilized, appreciated, and retained the benefits that Plaintiffs conferred.

192.   Defendants were, and are, aware of the benefits that Plaintiffs conferred upon them and have retained those benefits under circumstances that make it inequitable and unjust unless Plaintiffs are reasonably compensated.

193.   With respect to Marquee, Vanguard, Halperin, and Weitzman specifically: the consulting fees of $858,728.43 and $500,924.91, respectively, were funded from co-funder

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

capital, including Plaintiffs' contributions. Marquee, Vanguard, Halperin, and Weitzman had no contractual right to receive those fees because the condition precedent—a successful closing—was never satisfied. Halperin and Weitzman personally received and dissipated these funds. It would be unjust and inequitable for Marquee, Vanguard, Halperin, and Weitzman to retain those fees.

194.    Under the circumstances, it would be unjust and inequitable for Defendants to accept, utilize, appreciate, and retain the benefits that Plaintiffs conferred without payment to Plaintiffs.

195.    Plaintiffs are entitled to judgment against Defendants, and each of them, for the value of the benefits conferred, together with consequential damages including lost investment opportunities and other damages resulting from Plaintiffs' inability to use the stolen funds, in an amount to be proved at trial, but in no event less than $5,525,000.

196.    WHEREFORE, Plaintiffs pray for judgment against all Defendants in an amount to be proved at trial, but in no event less than $5,525,000, plus costs and pre- and post-judgment interest.

## ELEVENTH CLAIM FOR RELIEF

### (Accounting – Against All Defendants)

197.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

198.    A fiduciary or trust relationship exists between Plaintiffs and Defendants Centerstone and Peak Capital, by virtue of the escrow relationship and the Co-Funder Participation Agreements, respectively.

199.    Upon information and belief, Defendants Garcia & Phan, Phan, and Perea received and transferred Plaintiffs' funds among various accounts, and the precise amounts received and retained by each party are unknown to Plaintiffs.

200.    Marquee, Vanguard, Halperin, and Weitzman received consulting fees funded from co-funder capital, and the precise source and timing of those payments, and whether any portion has been transferred to other parties, are unknown to Plaintiffs.

201.    Upon information and belief, Warren and Capson received or caused to be received funds derived from Plaintiffs' contributions, and the precise amounts received and retained by each are unknown to Plaintiffs.

202.    Plaintiffs are entitled to a full and complete accounting from Defendants to determine the exact amount of funds received, retained, and/or transferred by each Defendant.

203.    WHEREFORE, Plaintiffs pray for a full accounting from each Defendant.

## TWELFTH CLAIM FOR RELIEF
### (Constructive Trust – Against Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, Weitzman, Warren, and Capson)

204.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

205.    Defendants Garcia & Phan, Phan, and Perea wrongfully obtained Plaintiffs' funds through the Wrongful Wire, in violation of the escrow instructions, the Co-Funder Participation Agreements, and the rights of Plaintiffs.

206.    Defendants Marquee, Vanguard, Halperin, and Weitzman wrongfully obtained funds derived from Plaintiffs' contributions by accepting consulting fees that were never earned and were never payable under their respective agreements. Halperin and Weitzman personally received and dissipated these funds.

207.    Upon information and belief, Defendants Warren and Capson wrongfully obtained or caused to be obtained funds derived from Plaintiffs' contributions through their orchestration of the fraudulent scheme.

208.    It would be inequitable for these Defendants to retain any funds derived from Plaintiffs' contributions.

209.    Plaintiffs are entitled to the imposition of a constructive trust over any and all funds in the possession of, or traceable to, Defendants Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, Weitzman, Warren, and Capson that are derived from or traceable to Plaintiffs' contributions.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                    36

210. WHEREFORE, Plaintiffs pray for the imposition of a constructive trust over all funds in the possession or control of Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, Weitzman, Warren, and Capson that are derived from or traceable to Plaintiffs' contributions.

**THIRTEENTH CLAIM FOR RELIEF**

**(Fraudulent Concealment – Against Centerstone, Olivarria, Phan, and Salazar)**

211. Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

212. Defendants Centerstone, Olivarria, Phan, and Salazar concealed and suppressed material facts from Plaintiffs, including that the April 9, 2026 Wrongful Wire had already removed Plaintiffs' funds from the escrow trust account; that Star Financial had not funded and would not fund the senior loan; that the buyer entity and the Star Financial loan documents were fabricated; and that the participants were executing a coordinated scheme to misappropriate co-funder capital.

213. These Defendants had a duty to disclose these facts to Plaintiffs because Centerstone and Olivarria stood in a fiduciary relationship with Plaintiffs as escrow holder and escrow officer; because each made partial representations about the status of the funds and the transaction while suppressing the truth; and because each had exclusive knowledge of material facts not reasonably accessible to Plaintiffs.

214. These Defendants intentionally concealed and suppressed these facts with the intent to defraud Plaintiffs and to induce them to wire their contributions and to refrain from demanding the immediate return of their funds.

215. Plaintiffs were unaware of the concealed facts and would have acted otherwise—by withholding their contributions or immediately demanding their return—had they known the truth.

216. As a direct and proximate result of these Defendants' concealment, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $5,525,000. These Defendants' conduct was willful, oppressive, fraudulent, and malicious, entitling Plaintiffs to an award of punitive damages.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                    37

217.   WHEREFORE, Plaintiffs pray for judgment against Centerstone, Olivarria, Phan, and Salazar, in an amount to be proved at trial, but in no event less than $5,525,000, plus punitive damages, costs, and pre- and post-judgment interest.

## FOURTEENTH CLAIM FOR RELIEF

**(Negligent Misrepresentation – Against Centerstone, Olivarria, and Salazar)**

218.   Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

219.   Centerstone, Olivarria, and Salazar made the representations of material fact described above, including that the co-funders' funds remained safely held in trust, that disbursements had been properly made, and that Star Financial had issued and funded its $92,000,000 loan.

220.   These Defendants made these representations without reasonable grounds for believing them to be true and in a manner not warranted by the information they possessed.

221.   These Defendants intended that Plaintiffs rely on the representations, and Plaintiffs justifiably relied on them by wiring their contributions and by refraining from demanding the immediate return of their funds.

222.   As a direct and proximate result, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $5,525,000.

223.   WHEREFORE, Plaintiffs pray for judgment against Centerstone, Olivarria, and Salazar, in an amount to be proved at trial, but in no event less than $5,525,000, plus costs and pre- and post-judgment interest.

## FIFTEENTH CLAIM FOR RELIEF
**(Aiding and Abetting Fraud, Breach of Fiduciary Duty, and Conversion – Against Salazar, Phan, Warren, Capson, Halperin, Weitzman, Marquee, and Vanguard)**

224.   Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

225.   Centerstone and Olivarria owed and breached fiduciary duties to Plaintiffs, and the principal actors committed fraud and conversion of Plaintiffs' funds, as alleged above.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                                        38

226. Defendants Salazar, Phan, Warren, Capson, Halperin, Weitzman, Marquee, and Vanguard knew that Centerstone and Olivarria were breaching their fiduciary duties and that Plaintiffs' funds were being obtained and retained by fraud and conversion.

227. These Defendants gave substantial assistance and encouragement to the wrongful conduct, including: Salazar, by supplying inside escrow access and fabricated lender documents and by relaying the false message that Star Financial had funded; Phan, by filing the pre-planned April 9, 2026 payment demand and by receiving and re-transferring the diverted funds; Warren and Capson, by constructing the transaction, fabricating the buyer entity documents, and participating in or directing the collusion call; and Halperin, Weitzman, Marquee, and Vanguard, by accepting and dissipating consulting fees drawn from co-funder capital after learning of the fraud and refusing to return them.

228. These Defendants' conduct was a substantial factor in causing Plaintiffs' harm. As a direct and proximate result, Plaintiffs have suffered damages in an amount to be proved at trial, but in no event less than $5,525,000. These Defendants' conduct was willful, oppressive, fraudulent, and malicious, entitling Plaintiffs to an award of punitive damages.

229. WHEREFORE, Plaintiffs pray for judgment against Salazar, Phan, Warren, Capson, Halperin, Weitzman, Marquee, and Vanguard, in an amount to be proved at trial, but in no event less than $5,525,000, plus punitive damages, costs, and pre- and post-judgment interest.

### SIXTEENTH CLAIM FOR RELIEF
**(Violation of California Penal Code § 496 – Against Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, and Weitzman)**

230. Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

231. Plaintiffs' funds were obtained from them in a manner constituting theft by false pretenses and were stolen within the meaning of California Penal Code sections 484 and 496.

232. Defendants Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, and Weitzman each received, concealed, and/or withheld property that had been so obtained, or aided in concealing or withholding such property, knowing that the property had been so obtained, in violation of Penal Code section 496(a).

COMPLAINT 39

233. Pursuant to Penal Code section 496(c), Plaintiffs are entitled to recover three times the amount of their actual damages, together with costs of suit and reasonable attorneys' fees.

234. WHEREFORE, Plaintiffs pray for judgment against Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, and Weitzman for three times Plaintiffs' actual damages pursuant to Penal Code section 496(c), together with reasonable attorneys' fees and costs of suit.

## SEVENTEENTH CLAIM FOR RELIEF

### (Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq. – Against All Defendants)

235. Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

236. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices within the meaning of Business and Professions Code section 17200, including the misappropriation of escrow funds, the making of false representations, the fabrication of loan and entity documents, the violation of the escrow instructions, and the receipt and retention of funds and fees to which they were not entitled.

237. These acts and practices are unlawful because they violate, among other laws, Penal Code sections 484 and 496 and the common law prohibitions against fraud, conversion, and breach of fiduciary duty; unfair because the harm they caused Plaintiffs outweighs any utility or justification; and fraudulent because they were likely to deceive Plaintiffs and the other co-funders.

238. As a direct and proximate result of Defendants' unfair competition, Plaintiffs suffered injury in fact and lost money and property.

239. Plaintiffs are entitled to restitution and disgorgement of all money and property Defendants acquired by means of their unfair competition, and to injunctive relief restraining Defendants from further transferring or dissipating funds traceable to Plaintiffs' contributions.

240. WHEREFORE, Plaintiffs pray for restitution, disgorgement, and injunctive relief against all Defendants pursuant to Business and Professions Code sections 17203 and 17204, together with costs of suit.

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                          40

**EIGHTEENTH CLAIM FOR RELIEF**
**(Common Count – Money Had and Received – Against Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, and Weitzman)**

241.    Plaintiffs reallege and incorporate by reference each of the allegations set forth above.

242.    Defendants Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, and Weitzman became indebted to Plaintiffs for money had and received for the use and benefit of Plaintiffs, in that each received money—the misappropriated escrow funds and the consulting fees funded from co-funder capital—that in equity and good conscience belongs to Plaintiffs.

243.    Plaintiffs have demanded the return of the money, and these Defendants have failed and refused, and continue to refuse, to repay it.

244.    As a result, Plaintiffs have been damaged in an amount to be proved at trial, but in no event less than $5,525,000, plus interest.

245.    WHEREFORE, Plaintiffs pray for judgment against Garcia & Phan, Phan, Perea, Marquee, Vanguard, Halperin, and Weitzman in an amount to be proved at trial, but in no event less than $5,525,000, plus costs and pre- and post-judgment interest.

**PRAYER**

WHEREFORE, Plaintiffs pray for relief as follows:

A. For compensatory damages, including both direct and consequential damages resulting from Plaintiffs' inability to invest the stolen funds, against all Defendants, and each of them, as more specifically prayed for herein, in an amount to be proved at trial, but in no event less than $5,580,250;

B. For punitive and exemplary damages according to proof;

C. For the imposition of a constructive trust over any and all funds in the possession of, or traceable to, Defendants that are derived from Plaintiffs' contributions;

D. For a full and complete accounting from each Defendant;

E. For pre-judgment and post-judgment interest at the maximum legal rate;

F. For an award of all of Plaintiffs' reasonable attorneys' fees and costs pursuant to the Co-Funder Participation Agreements and/or applicable law;

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT    41

G.  For treble damages;

H.  For costs of suit incurred herein; and

I.  For such other and further relief as this Court deems just, equitable, and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

DATED June 22, 2026.

DENTONS DURHAM JONE PINEGAR P.C.

/s/ David W. Tufts
David W. Tufts
Trinity Jordan
John R. Richardson
*Attorneys for Plaintiffs*

DENTONS DURHAM JONES PINEGAR P.C.
111 South Main Street, Suite 2400
Salt Lake City, UT 84111

COMPLAINT                                            42